**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OLUWOLE OYELOLA, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:12-CV-01685 (JCH) |
| v. | : | |
| | : | |
| HARTFORD FINANCIAL | : | FEBRUARY 5, 2014 |
| SERVICES GROUP, INC., | : | |
| Defendant. | : | |
| | : | |

**RULING RE: DEFENDANT'S MOTION TO DISMISS (Doc. No. 17)**

**I.      INTRODUCTION**

Defendant Hartford Financial Services Group, Inc.[1] ("The Hartford") has moved to

dismiss, in part, Plaintiff Oluwole Oyelola's ("Oyelola") Complaint for Employment

Discrimination ("Compl.") (Doc. No. 1).  Defendant's Motion to Dismiss ("Def.'s Mot. to

Dismiss") (Doc. No. 17).

Oyelola, a former employee of The Hartford, has filed suit against The Hartford

alleging race, color, and national origin discrimination in violation of Title VII of the Civil

Rights Act of 1964, as amended, title 42, United States Code, sections 2000e et. seq.

("Title VII") and 1981 ("section 1981") and age discrimination in violation of the Age

Discrimiantion in Employment Act of 1967, as amended, title 29, United States Code,

section 621 et. seq. ("ADEA") in connection with his employment and separation from

employment with The Hartford.  Compl. at ¶ 97; Complaint for Employment

Discrimination at 1.

---

[1] Defendant has noted that the "proper Defendant in this action is Hartford Fire
Insurance Company, a wholly owned subsidiary of Hartford Financial Services Group, Inc."
Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def.'s Mem.") (Doc. No. 17-
1) at 1 n.1.

The Hartford seeks dismissal of part of Oyelola's Complaint for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  It argues that: 1) Oyelola's claim of age discrimination under the ADEA should be dismissed because Oyelola has not alleged any events or incidents that he believes constitute age discrimination; 2) any claims of Title VII discrimination occurred over 300 days prior to Oyelola's filing of the underlying administrative complaint and thus are time-barred; and 3) any claims of section 1981 discrimination that occurred over three years prior to Oyelola's filing of this suit are time-barred.  Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def.'s Mem.") at 2.

## II.    FACTUAL BACKGROUND

Oyelola is a black American of Nigerian descent.  Compl. at ¶ 8.  The Hartford is a publicly trade Fortune 500 corporation with headquarters in Hartford, Connecticut.  Id. at ¶ 9.  Oyelola was first hired by The Hartford on November 6, 2000, as a Senior Fund Accountant/Senior Financial Analyst in the Investment Products Division of the Wealth Management Group unit in the Simsbury, Connecticut office.  Id. at 10.  Oyelola claims that he received positive performance reviews from the date of his hire until December 2005, when his unit was relocated.  Id. at ¶ 12.  He was unemployed from December 2005 to May 2006 due to the relocation, and was rehired at The Hartford on May 6, 2006 as a Financial Analyst in the Enterprise Risk Management-Global Derivatives/Hedging Corporate Finance Department, again in the Simsbury Office.  Id. at ¶¶ 13-14.

Oyelola describes multiple instances of workplace harassment and discrimination directed towards him.

A. <u>Pay Disparity</u>

Oyelola alleges that his annual salary in 2007 of $67,000 for his work as a Financial Analyst was substantially lower than his white predecessor's; he asserts that his predecessor was earning $90,000. <u>Id.</u> at ¶ 15. Though Oyelola's duties were identical to those of his predecessor, his predecessor was given the title of "Senior Financial Analyst." <u>Id.</u> at ¶ 16.

In October 2007, Oyelola's title was changed to "Associate Risk Analyst." <u>Id.</u> at ¶ 15. With the change in title, he received a new salary of $70,400. <u>Id.</u> at ¶ 95. This new salary was still substantially less than the annual salary of $120,000 to $130,000 generally given to Associate Risk Analysts. Two new employees brought into the department in late 2007 received $120,000, and were given the title of "Director," despite both performing the same duties as Oyelola. <u>Id.</u> at ¶ 37.

Following his reassignment to a different department and promotion to Assistant Director in 2011, Oyelola's annual salary was $86,000, substantially lower than the annual salary of $140,000 generally received by Assistant Directors. <u>Id.</u> at ¶ 94.

B. <u>Harassment, Discrimination, and Retaliation in the Simsbury Office</u>

Oyelola alleges that his instruction in early 2007 to report to Timothy Yi ("Yi"), the Assistant Director in his department, after having initially reported to Eric Claprood ("Claprood"), the Assistant Vice President, was "essential a demotion" of his responsibilities. <u>Id.</u> at ¶¶ 17-18. The only other employee reporting to Yi at that time was an actuarial student. <u>Id.</u> at ¶ 18. Oyelola was the only black person in the department at the time; Yi and the actuarial student are Asian-American. <u>Id.</u> at ¶¶ 17-18. Oyelola reports multiple occasions of harassment from Yi. Whenever Oyelola went

3

to Yi for direction, Yi would "raise his voice in anger and yell at" Oyelola.  Id. at ¶ 19.  In early 2007, Yi allegedly "yelled and screamed in anger" at Oyelola and "pushed [him] against the door of his office."  Id.  Oyelola claims that, whenever he worked late, Yi would unplug his computer, interrupting his work and forcing him to leave.  Id. at ¶ 21. When Yi saw Oyelola using a text book as a reference, he would walk into Oyelola's cubicle, close the book, and give it to the actuarial student.  Id. at ¶ 22.

On March 8, 2007, Oyelola emailed the Employee Assistant Program requesting a meeting; during the meeting, he complained of Yi's behavior and Claprood's attitude toward him and was directed to speak with Human Resources ("HR").  Id. at ¶ 23.  In April 2007, he filed a report with HR, which conducted an investigation but did nothing about his complaint.  Id. at ¶ 24.

Oyelola was assigned to report directly to William Grzesiak ("Grzesiak"), a white American, around February 2007; he reported to Grzesiak until he was transferred out of the department in March 2011.  Id. at ¶ 25.  In March 2007, Oyelola alleges that Grzesiak said to him, "while looking angrily at [him], 'do you want to work here, we will show you hell.'"  Id. at ¶ 26.  Oyelola reported Grzesiak's statement to Gregory Goumas ("Goumas") in HR, who met with Oyelola but allegedly "did nothing."  Id. at ¶ 27.

Oyelola claims that he was retaliated against by Claprood for filing complaints with HR.  Claprood gave him his first written warning on June 28, 2007, as retaliation. Id. at ¶ 28.  In June 2007, in another act of retaliation, Claprood gave Oyelola a severance package and ordered him to sign it without giving him a copy to review beforehand.  Id. at ¶ 29.  Oyelola did not sign the document.  Id.  In early July 2007, in a

4

further act of retaliation, Claprood began to write Oyelola up "to create documentation for . . . forc[ing]" Oyelola out of The Hartford.  Id. at ¶ 32.

Oyelola reported these acts of alleged retaliation to HR.  He informed Goumas about the severance package and Goumas, after speaking with Claprood, told Oyelola that Claprood should not have given him a severance package to sign and that Claprood was trying to force Oyelola out of the company.  Id. at ¶ 30.  Id.  Goumas then referred Oyelola to Sarah Haglin ("Haglin") in HR.  Id.  Haglin spoke with Claprood, and on August 10, 2007, she emailed Oyelola to follow-up on his complaint and her conversation with Claprood.  Id. at ¶¶ 31, 33.  Haglin, however, did not address Oyelola's complaints, and instead offered him "options" which included leaving The Hartford.  Id. at ¶ 33.

On August 14, 2007, Claprood gave Oyelola a settlement and general release agreement to sign, and told Oyelola that if he did not sign them, Claprood would give Oyelola a final warning.  Id. at ¶ 34.  Oyelola did not sign the documents and, in another act of alleged retaliation, Claprood gave Oyelola a final warning report on August 17, 2007.  Id.  Following this, Oyelola alerted HR to his plan to file a discrimination complaint with the Connecticut Commission on Human Rights and Opportunity ("CHRO").  Id. at ¶ 35.  Oyelola went to the CHRO to file his complaint and was referred to Legal Aid Services; he did not, however, file a complaint.  Id.  In late 2007, Claprood was fired for behavior unrelated to his conduct toward Oyelola.  Id. at ¶ 38.

Oyelola reports that in October 2007 and June 2008, documents concerning Nigerian email scams began to circulate in the office.  Id. at ¶ 49.  Oyelola met with HR in January and February of 2008 to report continuing racial harassment and hostility

from Grzesiak and Michael Nguyen ("Nguyen"), one of the new employees brought into the department in 2007.  Id. at ¶ 50.

In February of 2010, Oyelola complained that Nguyen had support staff working for him while Oyelola, despite performing the same tasks as Nguyen and his support staff, did not.  Id. at ¶ 51.  Following this complaint, Oyelola heard Christopher Abreau ("Abreau"), who had replaced Claprood as Assistant Vice President in 2007, say "nobody want to report to a nigger."  Id. at ¶ 52.  Oyelola informed HR of the ongoing abuse and hostility he was experiencing, but did not mention Abreau's racial slur because he feared retaliation.  Id. at ¶ 53.[2]

Oyelola alleges that his work was substantially reduced, over time, to elementary risk analyst functions and producing reports for Nguyen, who would then present them to senior management, the board of directors, and market analysts.  Id. at ¶ 55.

C. Excessive Hours

Oyelola alleges that he was forced to work multiple 32-hour shifts.  Id. at ¶¶ 39, 43.  The first such shift occurred on or about September 29, 2006: Claprood instructed Oyelola not to leave his workstation until after a computation that Claprood knew would be lengthy was completed, and threatened that Oyelola's "job depended on" the completion.  Id. at ¶ 40-41.  Oyelola claims that other analysts were allowed to complete the computation through less time-consuming means, but that Claprood specifically barred him from doing so.  Id. at ¶ 42.  Oyelola was again compelled, this time by

_____

[2] Following this allegation, Oyelola writes that "[t]he racial harassment and hostility continued into 2009, nevertheless."  Complaint ("Compl.") at ¶ 54.  It is unclear whether this statement, which follows allegations of racial harassment occurring in 2010, is a typo.  Oyelola's claim that he reported this harassment to HR, and that Goumas took note of this report on July 28, 2009 and August 7, 2009, but took no further action, suggests that it is not a typo.  Id. at ¶ 54.

Grzesiak, to work 32-hour shifts on April 1, 2007, October 1, 2008, January 3, 2010, and January 3, 2011, under threat of termination of his employment if he did not comply. Id. at ¶¶ 44-45.

D. Denial of Benefits

Oyelola alleges that he was precluded from taking extended paid time-off by his fear that he would lose his job if he did so.  Id. at ¶ 46.  He attributes this fear to racial discrimination.  Id.  Oyelola claims that Grzesiak had said that "we would wait till he takes time off and force him out of his position."  Id. at ¶ 47.  As a result of this perceived threat, Oyelola forfeited two to three weeks of his vacation paid time-off benefits for 2006, 2007, 2008, 2009, and 2010.  Id. at ¶ 48.  He was only paid, however, for unused vacation time for 2011.  Id.

E. Harassment, Discrimination, and Retaliation After Transfer to the Windsor Office

In 2011, Oyelola decided to change departments and applied for a position as an Assistant Director in a different department in the Windsor, Connecticut office of The Hartford.  Id. at ¶ 56.  Oyelola was hired for the position in the Windsor office; however, Grzesiak and Margaret Norton ("Norton"), a white American and Assistant Vice President and head of Oyelola's new department, agreed to require Oyelola to continue to perform certain duties of his old position, train Grzesiak and a new employee on these duties, and take on the responsibilities of his new position.  Id. at ¶¶ 57-58. Oyelola was working in both the Simsbury and Windsor offices at this time.  Id. at ¶ 59.

In March of 2011, on the first day of his new position in the Windsor office, an employee in his new department, James L'Esperance ("L'Esperance"), introduced Oyelola to Anne Janangelo ("Janangelo"), another employee in the department.  Id. at

7

60.  Upon hearing Oyelola's name, Janangelo allegedly said, "Is that the Nigerian guy? We don't want any Nigerians here."  Id.  Both L'Esperance and Janagelo are white Americans.  Id.  Oyelola did not file a complaint, he claims, because it was his first day in the new office.  Id. at ¶ 61.

Oyelola further alleges that Janangelo, with the collaboration of Norton, began profiling and conducting surveillance of Oyelola's activities as well as the activities of another black employee.  Id. at ¶ 63.  Janangelo, Oyelola claims, kept special notes and records on Oyelola but not on the white Assistant Directors in the department.  Id. at ¶ 64.  In May 2011, during Oyelola's first performance review, Norton told Janagelo to take notes on Oyelola; she then gave Oyelola a negative review because he did not sign off on a report.  Id. at ¶ 65.  Oyelola claims that was never informed that he was required to do so.  Id.

F.  Violation of Policy

As an Assistant Director, Oyelola was required to have a series 6 securities license.  Id. at ¶ 66.  Employees taking the exam were allowed to take it as many times as necessary until they passed.  Id. at ¶ 66.  Assistant Directors in the department were also encouraged, but not required, to obtain a series 26 securities license because it was considered "a plus" for the job.  Id. at ¶ 67.  Oyelola took, but failed, the series 6 examination in July and August of 2011.  Id. at ¶ 68.

In September 2011, Norton emailed Oyelola and the other assistant directors a July 2011 revised policy for the series 6 and series 26 securities license examinations and a schedule for Oyelola to take both exams.  Id. at ¶ 69.  The revised policy required assistant directors to take and pass one of the securities exams in no more than two

attempts within a 90-day period.  Id. at ¶ 71.  The new policy did not state that an assistant director who failed the series 26 exam in two attempts would be terminated; Oyelola alleges that directors were still allowed unlimited attempts to take the series 26 exam.  Id.

Pursuant to the new policy, Norton scheduled Oyelola's series 6 exam for September 30, 2011, allowing him only 28 days to prepare even though the policy afforded him a 90-day preparation period.  Id. at ¶ 72.  Oyelola suspected that Norton gave him less time to prepare for the exam because she wanted him to fail.  Id. at ¶ 73. Despite this, Oyelola passed the series 6 exam.  Id.

Norton also scheduled Oyelola to take the series 26 exam on October 31, 2011 and December 1, 2011, allowing him only 62 days in total to prepare.  Id. at ¶ 74. Oyelola asserts that this was a "clear violation of the new policy."  Id.  During a telephone conference with Norton and an HR consultant in October 2011, Oyelola protested that he was not being given enough time to prepare for the exam and that The Hartford policy and industry standards granted persons preparing for the exam 90 days. Id. at ¶ 75.  Norton allegedly insisted, and the HR consultant agreed, that Oyelola would have to take the series 26 exam within 62 days, not the 90 allowed by the new policy. Id. at ¶ 76.  On a later telephone conference with the HR consultant, Oyelola complained that Norton was "setting him up to fail."  Id. at ¶ 78.  He claimed that Norton had told him that she did not care what happened to him, that even if he were to pass the series 26 exam, she would find faults with his performance in other areas, and that she did not "see how [he] can work out the situations [management] had put in front of" him.  Id. at ¶¶ 78-80.

Oyelola alleges that Norton set him up to fail the series 26 exam so that she would have an excuse to fire him.  Id. at ¶ 81.  He states that Norton knew his work schedule, which included working his old position, training employees, and performing his new job functions, would not allow him time to prepare for both the series 6 and series 26 exams.  Id. at ¶¶ 82-83.  He further claims that Norton allowed white managers in the department more time to prepare for the securities exams than the new policy provided for.  Id. at ¶ 84.  L'Esperance and Robert Carbone, both white Assistant Directors in the department, had been allowed several unlimited attempts to take the series 26 exam before they finally passed in September 2011.  Id. at ¶ 85.  Norton gave three other white managers 180 days to take the series 26 exams.  Id. at ¶ 90.

Oyelola also claims that Norton sent him multiple emails, sometimes daily, sometimes weekly, from September 2011 to December 2011, requesting that he agree that his employment would be subject to termination if he did not pass the series 26 exam.  Id. at ¶ 86.  Oyelola asserts that Norton's request was unfounded because The Hartford's policy does not condition continued employment on passage of the series 26 exam.  Id.  Norton's repeated emails and telephone calls to Oyelola regarding the series 26 exam caused him "constant stress;" Norton continued the emails and calls during the October 2011 ice storm which had left Oyelola and his family without electricity, water, or food for nine days.  Id. at ¶¶ 87-88.  Oyelola states that he had to leave his children without food, water, or heat to sit for the series 26 exam in late October 2011.  Id. at ¶ 88.  He did not pass the exam.  Id.

Oyelola also failed the December 2011 series 26 exam.  Id. at ¶ 91.  On December 5, 2011, Norton terminated his employment, and cited his failure of the series

26 exams as the basis for her decision.  Id.  She did not provide him with any written documentation of her reason for terminating his employment.  Id. at ¶ 93.

Oyelola argues that The Hartford condoned and encouraged harassment and hostility towards him on the basis of his race, color, national origin, or ancestry and denied him terms and conditions of employment equal to that of his white co-workers, and that these actions violate title 42, United States Code, section 1981.  Id. at ¶ 97. He requests declaratory judgment that The Hartford violated section 1981, restitution, attorney's fees, compensatory and punitive damages, and any appropriate additional relief.  Id. at 29-30.

## III.    STANDARD OF REVIEW

On a motion to dismiss, all factual allegations in the complaint must be accepted as true, and the court must draw all reasonable inferences in the plaintiff's favor.  Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009).  "[A] motion to dismiss does not involve consideration of whether a plaintiff will ultimately prevail on the merits, but instead solely whether the claimant is entitled to offer evidence in support of his claims."  Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 65 (2d Cir.2010) (citation and quotation marks omitted).

Pursuant to the Federal Rules, a defendant may move to dismiss a complaint if it "fails to state a claim upon which relief may be granted."  Fed. R. Civ. P. 12(b)(6). In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Trans. Local 504, 992 F.2d 12, 14 (2d Cir. 1993).  To survive a motion pursuant to Rule 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009)

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S.Ct. at 1949 (2009)

(quoting Twombly, 550 U.S. at 556).

## IV.    DISCUSSION

### A. ADEA Claim

The Hartford contends that, though Oyelola has filed a claim of age

discrimination, he has provided no allegations of age discrimination other than checking

the box claiming discrimination under the ADEA on his form complaint and stating his

year of birth.  Def.'s Mem. at 4.  Oyelola, however, asserts that he has sufficiently pled

facts supporting his ADEA claim in paragraphs 23-37, 54-55, and 58-59 of his

Complaint.  Plaintiff's Reply to Defendant's Motion to Dismiss ("Pl.'s Reply") at ¶ 1.

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1).  An ADEA plaintiff need not plead a prima facie case of discrimination; merely

detailing the events leading up to the adverse employment action, providing relevant

dates, and including the ages of at least some of the relevant persons involved with his

termination will suffice for pleading purposes.  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 515 (2002).

Oyelola's Complaint contains no information at all about the ages of any of the persons involved with his termination or alleged harassment.  The sections of the Complaint cited by Oyelola as illustrative of age-based discrimination make no mention of age, either as a motivator of prejudicial treatment or otherwise.  See Compl. at ¶¶ 23-37 (describing multiple instances of retaliation after reporting allegedly racially-motivated abuse to human resources and the hiring of new employees who were paid more than Oyelola); ¶¶ 54-55 (alleging continuation of "racial harassment and hostility" and demotion of job responsibilities); ¶¶ 58-59 (noting that Oyelola was required to continue to perform functions of prior position while training other staff members and completing responsibilities from new position, and worked at two locations at the same time).  Further, the Complaint expressly cabins its claims to charges of racial and national origin discrimination in violation of section 1981.  Id. at ¶ 1 ("This action arises from discrimination and the use of racial slur, racial profiling and racial harassment and intimidation, condoned and practiced by the defendant against plaintiff because of race, color, or national origin or ancestry."); id. at ¶ 2 (invoking only authorization afforded court by section 1981); id. at ¶ 97 (asserting that The Hartford violated section 1981). The Complaint thus fails to state a claim for discrimination under the ADEA.

Oyelola's Reply to The Hartford's Motion to Dismiss, however, does provide the ages of some of the co-workers he alleges discriminated against him, and it suggests that his job responsibilities and pay were reduced because of his age.  Pl.'s Reply at. ¶

1.  The court thus dismisses Oyelola's age discrimination claim with leave to replead[3] those facts included in his Reply that support this claim.[4]

   B.  <u>Title VII and Section 1981 Claims</u>

     Title VII claims must be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the allegedly discriminatory act or acts if the claimant has already filed the charge of discrimination with a state or local equal employment agency.  42 U.S.C. § 2000e-5(e)(1); <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 712 (2d Cir. 1996).  Only those events that occurred during that 300-day period prior to filing are actionable under Title VII.  <u>Van Zant</u>, 80 F.3d at 712.  The statute of limitations for section 1981 claims is three years in Connecticut.  <u>See</u>, <u>e.g.</u>, <u>Rivera v. Men's Wearhouse, Inc.</u>, No. 3:05-cv-1907, 2006 WL 1801705, at *4 (D. Conn. June 27, 2006).

     The Hartford argues that only those acts occurring on or after February 22, 2011—300 days before December 19, 2011, the date Oyelola filed a complaint with the EEOC—are timely for the purposes of Oyelola's Title VII claim.  Def.'s Mem. at 7.  The Hartford also asserts that those allegations of discriminatory acts in violation of section

---

[3] Leave to amend is typically encouraged for deficient pleadings prepared by <u>pro</u> <u>se</u> plaintiffs like Oyelola.  <u>See</u> <u>Watts v. Services for the Underserved</u>, 309 F. App'x 533, 535 (2d Cir. 2009) ("[W]here the ground for dismissal is quite narrow and the plaintiff appears pro se, it was error to enter judgment . . . rather than permitting plaintiff at least one chance to cure a pleading defect."); <u>Gomez v. USAA Fed. Sav. Bank</u>, 171 F.3d 794, 795 (2d Cir.1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [pro se] complaint gives any indication that a valid claim might be stated.").

[4] As the ADEA requires that claimants in states with their own age discrimination agency file age discrimination charges with the Equal Employment Opportunity Commission within 300 days of the unlawful employment practice before bringing federal suit, Oyelola can only plead, as his age discrimination claim, those facts supporting this claim that occurred on or after February 22, 2011.  29 U.S.C. §§ 626(d)(1)(B), 633(b); <u>see</u> <u>also</u> <u>supra</u> section IV.B.

1981 that occurred prior to November 28, 2009—three years before Oyelola filed this suit on November 28, 2012, are time-barred and should be dismissed.  Id. at 8-9.  The Hartford specifically seeks the dismissal of the allegations found in paragraphs 15 through 55 and paragraph 95.  Id. at 8 n.3, 9 n.4.

Oyelola does not dispute that the allegations identified by The Hartford as untimely occurred outside of the limitations periods for Title VII and section 1981 claims. He instead insists that these allegations, when taken with his allegations of discrimination that are not time-barred, fall within the "continuing violation" exception to the statutes of limitations. Plaintiff's Objections to Defendant's Motion to Dismiss ("Pl.'s Obj.") (Doc. No. 34) at 5-7.

The "continuing violation" exception applies to those "claims that the discriminatory acts were part of a continuing policy and practice of prohibited discrimination . . . where one act of discrimination in furtherance of the ongoing policy occurred within the limitations period."  Lugo v. City of New York, 518 Fed. Appx. 28, 29 (2d Cir. 2013) (internal quotation marks and citations omitted).  "[A] series of separate acts that collectively constitute one 'unlawful employment practice'" can qualify as a continuing violation.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).  A party cannot invoke the continuing violation exception when he or she had knowledge after each wrongful act that it was actionable, but chose not to file a claim within the statute of limitations period.  Konigsberg v. Lefevre, 267 F.Supp.2d 255, 262 (N.D.N.Y. 2003).

Time-barred acts that create a hostile work environment claim can fall within the "continuing violation exception" because the "very nature" of a hostile work environment

15

"involves repeated conduct," and, therefore, "the 'unlawful unemployment practice' . . . cannot be said to occur on any particular day." Morgan, 536 U.S. at 115.  "[A] single act of harassment may not be actionable on its own." Id.  To determine whether a hostile work environment claim is actionable, the court must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 116. (internal quotation marks omitted).

In direct contrast to hostile work environment claims, which are "a series of separate acts that collectively constitute one 'unlawful employment practice,'" "discrete" acts of discrimination do not fall within the continuing violation exception, "even when they are related to acts allegedly in timely filed charges." Id. at 113, 117; see also Collins v. Cohen Pontani Lieberman & Pavane, No. 04cv8983, 2008 WL 2971668, at *4. (S.D.N.Y. July 31, 2008).  Discrete acts of discrimination cannot be converted "in a single unlawful practice for the purposes of timely filing;" "[e]ach discrete discriminatory act starts a new clock for filing charges alleging the act," and thus charges for each act must be filed within the limitations period. Morgan, 536 U.S. at 111, 113.  "Termination, failure to promote, denial of transfer, [and] refusal to hire" all qualify as "discrete" acts. Id. at 113.

Oyelola's allegations of being under-compensated, demoted, retaliated against, forced to work excessive hours, and denied benefits all involve discrete acts of discrimination. See Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 134 (2d Cir. 2003) ("[A]n employer performs a separate employment practice each time it takes

16

adverse action against an employee, even if that action is simply a periodic implementation of an adverse decision previously made."); see also Bazemore v. Friday, 478 U.S. 385, 395 (1986) (finding that each time an employer paid an employee less because of discriminatory reason, employer committed a separate unlawful employment practice); Valtchev v. City of New  York, 400 Fed. Appx. 586, 589 (2d Cir. 2010) (finding that retaliatory negative evaluations did not trigger the continuing violation exception); MacDonnell v. Liberty Central School Dist., 115 Fed. Appx. 489, 491 (2d Cir. 2004) (finding that a change in job responsibilities was a discrete discriminatory act, not part of a continuing violation).  The allegations of lesser pay, retaliation, demotion, excessive hours, and denial of benefits that occurred prior to the limitations period for both Title VII and section 1981 are thus time-barred, and they are dismissed.  However, Oyelola's claim that he was deprived of appropriate compensation after being promoted in March 2011 is not untimely under Title VII or section 1981, and his claims that he was forced to work excessive hours in January of 2010 and 2011 and that he was denied benefits for the year of 2010 are not untimely under section 1981.  Thus, these claims, on those bases, remain before the court.

As for the other allegations of discrimination that precede both limitations periods—harassment from Yi, a threat from Grzesiak, the circulation of articles discussing Nigerian email scams—the court finds that while they may constitute a hostile work environment claim, they are too far attenuated from those allegations that do fall within the limitations period to create a continuing violation claim.  Oyelola's encounters with Yi and Grzesiak, as well as the Nigerian email scam articles, all occurred within the Simsbury office.  The discrimination he experienced during the

limitations period occurred within the Windsor office, after he was promoted to a new position, and was largely perpetuated by Norton.  Oyelola has pled no connection between the discrimination he experienced in the Simsbury office and the discrimination in the Windsor office.  Thus, as the Simsbury office allegations do not involve conduct that occurred within the limitations period, they is time-barred.  See Fleming v. Verizon New York, Inc., 419 F.Supp.2d 455, 465-67 (S.D.N.Y. 2005) (finding that distinct hostile work environment claims that relied on allegations outside of the limitations period were time-barred).

Therefore, Oyelola's Title VII claims that rely on conduct that occurred prior to February 22, 2011, as well as his section 1981 claims that rely on conduct that occurred prior to November 28, 2009, are dismissed.

## V.    CONCLUSION

For the aforementioned reasons, The Hartford's Motion to Dismiss (Doc. No. 17) is **GRANTED**.  Oyelola is granted leave to file an amended complaint that pleads the facts supporting his ADEA claim that he included in his Reply, provided that they concern acts of discrimination that occurred on or after February 22, 2011.  Any amended complaint must be filed by **FEBRUARY 23, 2014**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 5th day of February, 2014.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge