UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

OLUWOLE OYELOLA,
      Plaintiff,

      v.                                             No. 12-cv-01685 (VAB)

HARTFORD FINANCIAL SERVICES
GROUP, INC.,
      Defendant.

### RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Oluwole Oyelola, brings this action against Defendant, Hartford Financial

Services Group, Inc., under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*,

alleging unlawful discrimination on the basis of his race, color, and national origin.[1]  Defendant

has moved for summary judgment, and for the reasons that follow, that motion is GRANTED.

## I.      STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that

there is no genuine issue of material fact to be tried and that the facts as to which there is no such

issue warrant judgment for the moving party as a matter of law.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 172 (2d Cir.

2005).  When ruling on a motion for summary judgment, the court may not try issues of fact, but

must leave those issues to the jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  Thus, the trial court's task is "carefully limited to discerning whether there are any

genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . .

---

[1] While the operative complaint, Plaintiff's Revised Amended Complaint [Doc. No. 65], alleges a claim under the
Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, Plaintiff's counsel stated at oral argument during
the December 15, 2015 hearing on this motion that Plaintiff has abandoned his claim for discrimination based on
age.

to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.*, 901 F. 2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Furthermore, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). However, the inferences drawn in favor of the nonmovant must be supported by evidence. "[M]ere speculation

2

and conjecture" is insufficient to defeat a motion for summary judgment, *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997), as is the "mere existence of a scintilla of evidence in support of the [nonmovant's] position," *Liberty Lobby*, 477 U.S. at 252.

## II.    FACTUAL BACKGROUND

On a motion for summary judgment, the Court must accept nonmovant's evidence as true and view the record in the light most favorable to him.  *See Weinstock*, 224 F.3d at 41; *Emonds v. Newman Chrysler, Inc.*, No. 3:03-cv-1114, 2005 WL 293493, at *2, 2005 U.S. Dist. LEXIS 1692, at *5 (D. Conn. Feb. 4, 2005).  The following is a recitation of the facts of this case, according to this standard.

Oluwole Oyelola, born in July 1957, and also known as "Wole" or "Wally," is of Nigerian descent.  Compl. [Doc. No. 65] ¶ 7; Pl. Ex. 2.  Hartford Fire Insurance Company ("The Hartford") is a wholly-owned subsidiary of Defendant, Hartford Financial Services Group, Inc., and was the employer of Mr. Oyelola during all times relevant to this matter.  Rule 56(a) Stmts. ¶ 1.  Mr. Oyelola began working for The Hartford on November 6, 2000 as a Senior Fund Accountant with an initial salary of $56,000 per year.  *Id.* ¶ 5.  His position was eliminated effective January 30, 2006, as part of a re-organization of his department.  *Id.* ¶ 7.  In May 2006, The Hartford re-hired Mr. Oyelola, who was then 48 years of age, as a Financial Analyst within the Enterprise Risk Management ("ERM") Global Derivatives group located in Simsbury, Connecticut, with an annual salary of $67,000.  *Id.* ¶¶ 8-10.

Mr. Oyelola reported to William Grzesiak, who is white, from about August 2007 through March 2011.  *Id.* ¶ 11.  During this time, Mr. Oyelola's job responsibilities included: preparing the monthly schedule of operating income, asset, and liability performance attribution analysis and the liability inforce trend summary; compiling hedging performance report

summaries; and preparing and updating documentation for Sarbanes-Oxley Act ("SOX")

certifications and for the quarterly and annual SOX audit.  *Id.* ¶ 12.  Mr. Oyelola made numerous

internal complaints during this period alleging various acts of harassment, discrimination, or

retaliation.  Oyelola Dep. 151:3-159:23.

On February 22, 2011, The Hartford promoted Mr. Oyelola to Assistant Director,

Financial Analysis Quality Control Accounting Team within its Trading & Clearing Department

located in Windsor, Connecticut.  *Id.* ¶ 13.  He had initially interviewed for the position with

Peter Michalik, who was the head of the Trading & Clearing Department at the time, but Mr.

Michalik's employment with The Hartford ended on February 8, 2011.  Oyelola Dep. 31:2-9; Pl.

Ex. 12, at 15; Def. Ex. 59.  Margaret Norton, who is white and was born in September 1956,

began her employment with The Hartford as Assistant Vice President ("AVP") within the

Trading & Clearing Department on January 18, 2011.  Def. Ex. 62 ¶¶ 2, 5.  Ms. Norton received

and reviewed Mr. Oyelola's résumé on or about January 27, 2011, requested to interview Mr.

Oyelola the next day, interviewed him on February 8, 2011, and received a note from Mr.

Oyelola, thanking her for meeting with him and considering him for the position that same day.

Rule 56(a) Stmts. ¶ 15.  Mr. Oyelola began his new position of Assistant Director on March 16,

2011, and reported to Ms. Norton throughout the entire time he held the position.  *Id.* ¶ 18.  Even

after beginning his new job, however, Mr. Oyelola was required to continue performing

functions related to his previous position in the Simsbury location.  Pl. Ex. 2, at 15-16; Oyelola

Dep. 184:19-21.

In the Assistant Director role, Mr. Oyelola's annual salary increased to $86,000, and he

was in charge of the team responsible for the accounting, operational compliance, and quality

assurance functions within the Trading & Clearing Department.  Rule 56(a) Stmts. ¶ 20.  At the

time of his promotion, there were two other Assistant Directors reporting to Ms. Norton: James

L'Esperance, who is white and was born in December 1974, and Robert Carbone, who is white

and was born in September 1962. *Id.* ¶ 21. Mr. L'Esperance served as Assistant Director in

charge of the New Products & Initiatives team, and he had worked at The Hartford in multiple

positions since his initial hire on August 21, 2000. *Id.* ¶ 22; L'Esperance Aff. ¶ 9. Mr. Carbone

served as Assistant Director of the Production team, and had more than twenty-five years of

experience at The Hartford and other insurance companies prior to being hired as an assistant

director in the Trading & Clearing Department on March 8, 2010. Rule 56(a) Stmts. ¶¶ 23, 25.

FINRA is the regulatory body of the Securities and Exchange Commission that oversees

the licensing of brokers who work in the financial industry; a FINRA Series 6 license authorizes

brokers to transact certain investment securities, while a FINRA Series 26 license is a

supervisory license that enables a manager to supervise employees who have FINRA Series 6

licenses. *Id.* ¶¶ 27-29. On February 1, 2010, a project team from The Hartford's Compliance

Department issued a report recommending, among other things, that any manager who

supervised staff members with a FINRA Series 6 license would need to be licensed ("February

2010 Report"). *Id.* ¶ 30. The February 2010 Report recommended that employees identified as

requiring a Series 6 or Series 26 license would have two opportunities within a 90-day period to

pass the required exam. *Id.* ¶ 31.

On January 18, 2011, The Hartford's Compliance Department notified Mr. L'Esperance

and Mr. Carbone that, because they were managing FINRA registered representatives at the time,

they needed to obtain Series 26 licenses as soon as possible, but no later than May 19, 2011.

Def. Ex. 10. On February 1, 2011, Ms. Norton sent an e-mail to the two, instructing them to

meet this licensing requirement "within the windows that compliance opened for you - 5/19/11."

Def. Ex. 70.  Mr. L'Esperance and Mr. Carbone had already obtained their Series 6 licenses at this point, having passing the relevant examination in June 2002 and August 2010, respectively. Rule 56(a) Stmts. ¶¶ 35-36.  They subsequently passed their examinations for the Series 26 license on May 12, 2011, and May 16, 2011, respectively.  *Id.*

Mr. Oyelola testified that the job description he was presented when he was being hired for the position states that "Series 26 is nice to have but not required."  Oyelola Dep. 233:13-14. The first contact Mr. Oyelola had from the Compliance Department concerning the FINRA licenses was an e-mail dated March 17, 2011, the second day of Mr. Oyelola's tenure as Assistant Director, with the subject line, "RE: Series 6 - new registrant (Wole Oyelola)," in which Compliance Specialist Anthony Zaremba wrote, "When you have a moment please complete the attached registration paperwork.  This is the first step in getting you registered to open your series 6 exam window."

This was followed by another e-mail from Mr. Zaremba, dated May 12, 2011, with the subject line, "Series 6," in which he wrote, "Did I ever contact you about obtaining FINRA registrations?  I can't remember if I did or not. . . .  [I]n order to start the registration process I need the attached packet to be completed.  Could you please complete it as soon as possible and return it to me?"  Def. Ex. 16.  Subsequent FINRA license-related correspondence over the next few months contained no mention that Mr. Oyelola was required to obtain the Series 26 license.

Regardless of whether Mr. Oyelola had notice that the Series 26 license was a requirement for his position at The Hartford, he had been planning to obtain both FINRA licenses from early in his tenure.  "Shortly after [he] began working in the Assistant Director position, he requested to get study materials for both the FINRA Series 6 & 26 license exams." Rule 56(a) Stmts. ¶ 37.  Eventually, The Hartford ordered and paid for study materials that Mr.

Oyelola received by about June 2011.  *Id.* ¶¶ 38-39; Oyelola Dep. 61:3-7.  On June 9, 2011, Mr.

Oyelola advised Ms. Norton that one of his development goals was to obtain the FINRA Series 6

and 26 licenses.  Def. Ex. 18.  In early July 2011, Mr. Oyelola took two days of classes paid for

by The Hartford to prepare for the FINRA Series 6 license exam.  Rule 56(a) Stmts. ¶ 44.  As

with the Series 26 exams for Mr. L'Esperance and Mr. Carbone, Mr. Oyelola was given a

window period during which to take the Series 6 exam—in his case, the window was from July

8, 2011 to November 5, 2011.  Def. Ex. 21, at 4.  Mr. Oyelola then took the FINRA Series 6

examination on July 19, 2011 and again on August 20, 2011, failing the exam both times.  *Id.* ¶¶

46-47.

Ms. Norton also expressly informed Mr. Oyelola that the Series 26 license was a

requirement for his position in his interim performance review, sent to him at 1:28 p.m. on

Friday, August 26, 2011, in which Ms. Norton wrote a comment stating that "Series 6 & 26 is a

requirement for Wole's current role . . . .  Wole must successfully obtain both licenses by the end

of the third quarter 2011."  Def. Ex. 25, at 7.  She later sent an e-mail on September 2, 2011, at

8:46 a.m., with the subject line, "FINRA Licenses Discussion Sept 1, 2011," in which she wrote,

"Per our discussion today, FINRA Series 6 & 26 are requirements for your position . . . .  If you

fail to obtain your Series 6 License by Sept 30, 2011 and/or your Series 26 License by Oct. 31,

2011 you will not be able to fulfill the responsibilities of your current position and your

employment will be subject to termination."  Def. Ex. 26, at 1.

In other words, Ms. Norton made clear to Mr. Oyelola that, if he did not pass the Series 6

exam by September 30, 2011, and the Series 26 exam by October 31, 2011, his employment

would be subject to termination.  She noted that Mr. Oyelola had already "failed two attempts

(July 19 & Aug. 20, 2011) to pass the Series 6 exam."  *Id*.  At this time, she also provided Mr.

Oyelola with a copy the *FINRA Series 6 Employee Guide: Revised: July 2011* (the "Employee Guide"), which stated that: The Hartford had "determined that a FINRA Series 6, and in some cases, a Series 26, license will be required for some positions within the organization"; that "[e]mployees hired or internally transferring into a position requiring Series 6 licensure after April 1, 2010 will have **two** opportunities in a **90 day period** to pass the Series 6 or Series 26 exam.  (Separate 90 periods are allowed for each required exam.)"; and that "[f]or positions requiring licensing successful completion of the testing is a condition of employment.  Failure can result in termination of employment."  *Id.*, at 4.

On September 2, 2011, Ms. Norton also sent an e-mail to all of the managers within the Trading & Clearing Department, including Mr. Oyelola, with copies of the Employee Guide and The Hartford's *FINRA Licensing (Series 6/26) Leaders Guide: Revised: July 2011* ("Leaders Guide") as attachments, stating that "[a]ll managers and [Assistant Directors] that have Series 6 individuals on their staff are REQUIRED to have Series 6 & 26 licenses."  Def. Ex. 27.  The provisions in the Leaders Guide mirrored the provisions in the Employee Guide quoted above. Def. Ex. 27, at 4.

After receiving Ms. Norton's e-mails on September 2, 2011, Mr. Oyelola immediately attempted to schedule his next Series 6 exam, but the earliest available date was Saturday, October 1, 2011.  Def. Ex. 28, at 2.  Ms. Norton approved this change to their agreed-upon schedule, but reiterated that he also needed to pass the Series 26 exam by October 31; Mr. Oyelola acknowledged that this was his goal, but pointed out that he could not schedule a Series 26 exam until the Compliance Department opened a window for him to take the exam, which would not happen until October 1, 2011.  *Id.* at 1.  On September 30, 2011, Mr. Oyelola

8

cancelled his Series 6 exam that was scheduled for the next day; he then rescheduled it for October 7, 2011, at which time he took and passed the exam.  Rule 56(a) Stmts. ¶ 62.

The Compliance Department thereafter opened a window for Mr. Oyelola to take the Series 26 exam between October 2011 and January 2012, but Ms. Norton continued to insist that he take and pass the exam by October 31, 2011.  *See* Pl. Ex. 2, at 20-22.  On October 10, 2011, Ms. Norton and Mr. Oyelola participated in a telephone conference call with Sandra Bryant, a Human Resources representative at The Hartford.  Pl. Ex. 2, at 21.  At this meeting, Mr. Oyelola protested that he was not being given the full ninety days to study that was provided for by company policy, but Ms. Bryant agreed with Ms. Norton's decision that he would not be allowed that much time.  *Id.*  Therefore, on October 14, 2011, Mr. Oyelola scheduled his Series 26 exam for October 31, 2011, and notified members of his team that he would be blocking off certain hours for the ensuing two weeks to prepare for the exam.  Rule 56(a) Stmts. ¶ 64.  In late October and early November 2011, severe weather conditions affecting the entire State of Connecticut deprived Mr. Oyelola and many others throughout the State of electrical power, and resulted in Mr. Oyelola being unable to access his online study materials during this time.  Oyelola Dep. 98:22-99:3; Compl. ¶ 54.  In the midst of this situation, Mr. Oyelola contacted Ms. Bryant concerning the exam, but he was repeatedly called by Ms. Norton, who advised him that he must sit for the exam or face termination.  Oyelola Dep. 98:24-99:5.  Mr. Oyelola took the exam, but failed.  Rule 56(a) Stmts. ¶ 66.

On November 2, 2011, Ms. Norton notified Mr. Oyelola that he would need to take the Series 26 exam again at the earliest opportunity, which was November 30, 2011, and that if he was unsuccessful, he would be subject to termination.  Def. Ex. 33.  He took the exam on December 1, 2011, and failed again.  Rule 56(a) Stmts. ¶ 69.  Mr. Oyelola was terminated on

December 6, 2011; the reason given was that he "did not meet all of the requirements of his

position," and specifically because he did not pass the Series 26 exam.  Def. Ex. 60; Oyelola

Dep. 236:3-5.

On or about December 19, 2011, Mr. Oyelola filed a complaint of unlawful

discrimination based on age, race, and national origin with the Connecticut Commission on

Human Rights ("CHRO") and the United States Equal Employment Opportunities Commission

("EEOC").  *See* Pl. Ex. 2.  He received notices indicating exhaustion of administrative remedies

in September 2012, *see* Doc. No. 1-1, at 96-97, and he commenced this action on November 28,

2012.

## III.    DISCUSSION

Mr. Oyelola's remaining claims against The Hartford arise under Title VII—claims of

disparate treatment and a hostile work environment by his employer on the basis of his color,

race, and national origin.  Under the *McDonnell Douglas* burden-shifting framework, Mr.

Oyelola first must establish a prima facie case of unlawful discrimination.  *See Weinstock v.*

*Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d

93, 106 (2d Cir. 2010).  This is a "*de minimis* burden of proof," *Weinstock*, 224 F.3d at 42, which

if satisfied, shifts the burden to Defendant to articulate "a legitimate, nondiscriminatory reason"

for the adverse employment actions, which is a burden "of production, not persuasion," and can

"involve no credibility assessment."  *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142 (2000)

(internal quotations and citations omitted).  Defendant's burden is satisfied if the proffered

evidence "taken as true, would permit the conclusion that there was a nondiscriminatory reason

for the adverse action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  "Although

the burden of production shifts to the defendant, the ultimate burden of persuading the trier of

10

fact of intentional discrimination remains at all times with the plaintiff." *Scaria v. Rubin*, 117

F.3d 652, 654 (2d Cir. 1997).

If The Hartford articulates a race-neutral basis for the adverse employment actions, the

burden then shifts back to Mr. Oyelola to "come forward with evidence that defendant's

proffered, non-discriminatory reason is a mere pretext for actual discrimination." *See Weinstock*,

224 F.3d at 42. Oyeloloa "may attempt to establish that he was the victim of intentional

discrimination by showing that the employer's proffered explanation is unworthy of credence."

*Reeves*, 530 U.S. at 143. "Thus, a plaintiff's prima facie case combined with sufficient evidence

to find that the defendants' proffered justification is pretextual will be sufficient to survive

summary judgment because a jury would be permitted to infer from such evidence that real

reason for the employment action was discriminatory." *Norris v. Metro-N. Commuter R. Co.*,

522 F. Supp. 2d 402, 408-09 (D. Conn. 2007).

### A.      Disparate Treatment

Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's

termination: The Hartford instituted a requirement, before Mr. Oyelola was even hired, for

Assistant Directors in the Trading & Clearing Department to obtain FINRA Series 6 and Series

26 licenses within ninety-day windows and Mr. Oyelola never obtained his Series 26 license,

even after having worked as an Assistant Director for nine months. Thus, to survive summary

judgment, Mr. Oyelola must show that this reason was pretextual and the real reason was

discriminatory animus. The Court finds that Plaintiff cannot meet this burden and therefore

dismisses his disparate treatment claim.

Mr. Oyelola argues that other Assistant Directors in the department were given unlimited

time and opportunities to pass the relevant exams and, as a result, his failure to obtain the

necessary licenses was not the real reason for his termination.  The record evidence, however, does not support such a claim.  Mr. L'Esperance and Mr. Carbone passed the Series 26 exam on their first attempts and within four months of being notified of the requirement.  *See* Rule 56(a) Stmts. ¶¶ 35-36.  Even accepting Mr. Oyelola's assertion that he did not receive notice of the Series 26 license requirement until about August or September 2011, he still took and failed the exam twice over the subsequent three-month period.  Under The Hartford's policy, employees who were required to obtain a Series 26 license would be given two attempts to pass the exam, and that failure to do so would be grounds for termination.  *See* Def. Ex. 26, at 4.

Mr. Oyelola also argues that the Series 26 license was not a true requirement for his position because it was not included in the job description he was presented when he was hired. However, the company referenced the requirement in other company documents, and communicated this requirement to other individuals whom Mr. Oyelola points to as comparators, *e.g.*, Mr. L'Esperance and Mr. Carbone.  In addition, the company explicitly informed Mr. Oyelola of this requirement by no later than September 2, 2011.  While the Court "must ensure that employers do not act in a discriminatory fashion, [it] do[es] not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (internal quotation marks and citation omitted).  Thus, it is irrelevant that Mr. Oyelola did not consider the Series 26 license to be essential to his job.  The record reflects that his employer did consider it to be so, and that his employer required others similarly-situated to Mr. Oyelola to fulfill that requirement.

Moreover, the record reflects that Mr. Oyelola knew from reading the job description before he was hired that the position did require him to obtain a Series 6 license.  Oyelola Dep. 35:25-36:3.  As with the Series 26 license, The Hartford's policy afforded him two opportunities

to pass the Series 6 exam or be subject to termination.  He failed the Series 6 exam twice—once in July and once in August—and instead of being terminated, he was given another chance to pass the exam.  Def. Ex. 26, at 1.  Mr. Oyelola also knew that, if he did not pass the Series 6 exam by September 30, he would be subject to termination.  *Id.*  He nevertheless cancelled his September 30 exam without receiving permission from The Hartford or, even giving them notice, and instead of being terminated, the company permitted him to take the exam a third time on October 7.

In other words, under the company's stated policy, The Hartford had a legitimate, nondiscriminatory basis for terminating Mr. Oyelola's employment on October 1, 2011 for his failure not only to pass the Series 6 exam after failing twice, but also because he failed to take the Series 6 exam a third time when he was scheduled to do so.  The company, however, gave him another chance.  Likewise, Ms. Norton and Mr. Oyelola agreed that failure to pass the Series 26 exam by October 31 would be grounds for termination, and, when Mr. Oyelola failed his October 31 exam, The Hartford gave him yet another chance, allowing him to take the exam again on December 1.

A reasonable juror could not infer that, in giving Plaintiff all of these extra chances, The Hartford had discriminated against him on the basis of his race, color, and/or national origin, simply because he was not given a full 90-day period to study for the Series 26 exam after he finally passed the Series 6 exam, particularly in the absence of any evidence that other similarly-situated employees were subjected to more favorable treatment.  On this record, this claim must be dismissed.

### B.    Hostile Work Environment

Actionable discrimination claims based on the presence of a hostile work environment

under Title VII and the ADEA exist "when the workplace is 'permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the

victim's employment. . . .'"  *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir.

1999) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  In assessing such

claims, courts "apply a standard with both an objective and subjective component, and [] assess

the totality of the circumstances, including: the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  *Cristofaro v. Lake

Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012).

As a preliminary matter, the Court notes that Mr. Oyelola's claims of a hostile work

environment in the Simsbury office already have been dismissed from this litigation as time-

barred.  *See Oyelola v. Hartford Fin. Servs. Group*, No. 3:12-cv-01685-JCH, 2014 WL 496880,

at *9, 2014 U.S. Dist. LEXIS 14699, at *26-27, (D. Conn. Feb. 5, 2014).  Therefore, the Court

now considers only whether Mr. Oyelola's hostile work environment claim concerning his tenure

in the Windsor office should survive summary judgment.

Mr. Oyelola alleges that, on his first day as Assistant Director in Windsor, Anne

Janangelo, a white Compliance Specialist in the Trading & Clearing Department who worked

under the supervision of Ms. Norton and was a subordinate of Mr. Oyelola, said to him, "Is that

the Nigerian guy?  We don't want any Nigerians here."  Compl. ¶ 28; Oyelola Dep. 173:22-

174:24.  This single incident does not suffice to establish that Mr. Oyelola's workplace was

permeated with discriminatory intimidation, ridicule, and insult sufficiently pervasive to alter the

conditions of his employment.

> As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. . . . [A] single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace. . . . In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.

*Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citations

omitted). This single comment over a nine-month period can hardly be considered "continuous

and concerted," and it is not so "extraordinarily severe" as to have altered the conditions of Mr.

Oyelola's working environment. Courts have routinely dismissed claims for insufficiency of

evidence even though, compared to this case, they involved (1) a similar or greater number of

incidents, (2) that were more compressed in time, and (3) that were more severe and had more

pronounced discriminatory overtones. *See*, *e.g.*, *Quinn v. Green Tree Credit Corp.*, 159 F.3d

759, 768 (2d Cir. 1998) (an appreciative comment about plaintiff's buttocks and a deliberate

touching of her breasts); *Brown v. Middaugh*, 41 F. Supp. 2d 172, 187-88 (N.D.N.Y. 1999)

(repeated references to plaintiff by a severe racial slur and use of Nazi salutes, slogans, and

taunts); *Bolden v. New York Hous. Auth.*, No. 96-cv-2835, 1997 U.S. Dist. LEXIS 16772, at *4-

5, 1997 WL 666236, at *2 (S.D.N.Y. Oct. 27, 1997) (five racial references over a period of six

weeks); *Sedotto v. Borg-Warner Protective Servs. Corp.*, 94 F. Supp. 2d 251, 264 (D. Conn.

2000) (reference to plaintiff as "grandmother").

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 68] is

GRANTED.

SO ORDERED at Bridgeport, Connecticut, this 17th day of December, 2015.


    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge